# Expert Opinion Affidavit
# of Daniel G. Fink

*Tiffany Roberts v. Garrison Property and Casualty Insurance Company*

U. S. District Court, District of Arizona Case No.: 2:19-cv-01232

**STATE OF ARIZONA**      )
        ) ss

**COUNTY OF MARICOPA**      )

Daniel G. Fink deposes and says as follows:

I based my opinions in this report on my education and more than 34 years of insurance experience as an agent/producer, agency owner, and instructor.  All opinions expressed here are to a reasonable degree of professional certainty.

## 1. Expert's Qualifications[1]:

- I have been an active insurance producer for over 34 years working in Arizona and Michigan.  I also have been licensed and have written insurance in other states.  I have experience in personal and business insurance sales and service, including homeowners' coverages and provided insurance on hundreds of homes.  I started an insurance agency and merged it into a larger agency in Glendale, AZ.

- I tested for and earned designations of CIC (Certified Insurance Counselor), CRM (Certified Risk Manager), and (AAI) Accredited Advisor in Insurance.  I regularly attend continuing education classes to maintain these my CIC and CRM designations.

- I have studied insurance coverages and forms as well as agent practices.  In addition to holding my insurance licenses, I have worked on the committee reviewing the questions in the Arizona State insurance licensing exam for accuracy.

---

[1] My curriculum vitae is attached hereto as Exhibit 1.

- I have taught insurance classes for producers' continuing education as well as for their certification in the CIC and CISR (Certified Insurance Service Representative) and other programs, including many courses on personal homeowners' coverages.  I have written and presented continuing education classes for agent associations as well as speaking on insurance topics to associations and industry groups.

- I have served as President and Board Member of the Independent Insurance Agents and Brokers of Arizona (IIABAZ) as well as serving as Chairman of its Education Committee.

- Recently, I have also worked directly for an insurance program administrator/managing general agency.  I have called on many agents across Arizona and other states to assist them in insurance sales and information.

- Based on my experience in insurance, I am qualified to express opinions on the standard of care of the licensed professional and carrier in this case.

- My Recent Writings:
  Ruble Advanced Topic Seminars for the Society of CIC:
    - PAP vs. BAP: Insuring Autos and Drivers Correctly
    - Insuring Hurting Employees: WC & EPLI

## 2. Scope

I was retained by Hagens Berman Sobol Shapiro LLP to opine on these items:

1. 10% Cap Provision -- Applicable standards as to Garrison's position, investigation, timeliness of payment, and communications with insured.

2. Claimed referral to outside counsel – Applicable standards as to Garrison's investigation, communications with insured, and communications with insured's counsel regarding the supposed referral to outside counsel and supposed second referral to in-house counsel, including whether any referral was even needed and whether the referral went to a person with the willingness or ability to address it.

3. Verification of ownership – Applicable standards as to Garrison's position and investigation, relative to internal policies regarding verification of ownership.

4. Threat to withhold conceded coverage payment unless suit dismissed Applicable standards as to Garrison's position, communication, and negotiations with insured.

### 3. Factual Basis

I based this Expert Opinion Affidavit on the materials I have received thus far regarding this case:

1. 2019.01.08 Class Action Complaint – Jury Demand
2. 2019.04.01 Answer
3. 2019.05.01 Defendant Garrison's MIDR
4. 2019.05.01 Plaintiff's Initial Disclosures Pursuant to MDIP
5. 2019.05.01 Plaintiff's First Supplemental Disclosure Statement
6. 2019.07.26 Garrison's Responses to Plaintiff's First Set of RFPs and ROGs
7. 2019.09.17 Garrison's Supplemental Responses to RFAs
8. 2019.11.04 Garrison's Responses to 2nd set of Combined Discovery Requests
9. 2019.11.04 Garrison's Responses to 3rd set of Combined Discovery Requests
10. 2019.11.15 Garrison's First Supplemental Mandatory Initial Discovery Responses
11. 2020.02.19 Plaintiff's Responses and Objections to Defendant's First Set of Combined Disc (1241532.1)
12. Defendants Documents (USAA 00001 – USAA 01226)
13. Plaintiffs' Documents – Roberts 000001 – Roberts _000274
14. Phone Call Recording (2105318722) 11_15_04 26-01-2019.amr

**References:**

Carey for Rebert B. Carey, Plaintiff attorney
Dodd for Dawn Dodd, property adjuster for Defendant
Garrison for Garrison Property and Casualty Insurance Company, a Texas corporation, Defendant
Mattison for James Mattison, contract attorney for Defendant
Moran for Lisa Moran, property adjuster for defendant
Roberts for Tiffany Roberts, Plaintiff

**4. Timeline**

- **2011**: Tiffany Roberts (Roberts) purchased her first homeowners' (HO) insurance policy from USAA and continues to turn to them for her home insurance coverages through 2019.

- **July 10, 2018**: Roberts renews her 7th policy from USAA, which includes a promise from USAA to pay up to $168,000 for loss to her personal property (PP). In the policy, USAA promises to cover PP in her home or "anywhere in the world" (USAA HO Policy HO-9R(02) Page 4 of 34).

- **Sept. 9, 2018**: Roberts' personal property is stolen from a public storage facility where she had it stored. She provided notice of loss to Garrison Property and Casualty Insurance Company, a USAA affiliate (Garrison). There is a provision in the policy that limits coverage of personal property, but it has no application to this claim. The policy provision states, "the amount of insurance for personal property usually located at any "insured's" residence, **other than the "residence premises"** is limited to 10% of the amount of insurance for Personal Property Protection, or $1,000 whichever is greater." (Emphasis added.) But since this stolen personal property was not in any secondary residence of the insured, this provision has no bearing on this claim. Roberts only owned one home/residence. Thus, this limitation did not apply to any of her personal property.

- **Sept. 9, 2018**: Garrison sends Roberts a claim acknowledgment letter. It stated, "Thank you for trusting USAA with your insurance needs. My name is Dawn Dodd (Dodd), and I'm handling your property claim."

- **Oct. 2, 2018**: Dodd's entry into the claims file indicates that she had correctly read the policy and was ready to pay the claim in light of her not finding any applicable limitation. Dodd asks the question about the 10% limitation, but then makes the correct assessment that it does not apply. She writes, "the storage facility is not an insured's residence." Despite Dodd's proper evaluation of coverage, management got involved in the case and referred it to legal counsel. The next entry into the claims file is not by Dodd, but by Anna Schultz (Schultz). Dodd stated that the referral was not mandatory and the Garrison forms as for the referral reason, Schultz writes, "Manager recommendation: recommending us to afford coverage based on policy language." But Garrison did not follow the unambiguous policy language; instead, they tried to limit this loss. Dodd had previously

answered the question, "Is this a mandatory referral?" "No."  But it was referred to legal counsel, nonetheless.

- **Oct. 7, 2018:** In-house legal counsel James Mattison (Mattison) offered his opinion, which was unfounded and not based on Robert's policy.  He does not follow Dodd's finding that "the storage facility is not an insured's residence."  Instead, Mattison states that PP in storage facilities is limited to 10% of the total limit.  Since that provision is not in Roberts' policy, one can only guess how he made that determination.  Mattison writes, "The limit stated in the Dec (Policy Declaration Page) is reduced by 90% while in storage".  Roberts' policy had no limit on personal property in storage, a fact that when confronted months later, Mattison admits to being true.  After Mattison's erroneous opinion in opposition to Dodd's findings, Dodd does not work on this claim again.

- **Oct 10, 2018**:  Roberts' attorney Robert B. Carey (Carey) wrote to Garrison and told them that their determination on coverage is untenable under the language of the policy.  "It would be impossible for the exemption to apply."  He addressed the fact that the exclusion cited incorrectly by Garrison only applied to property at a secondary residence, and Roberts had no secondary residence.  She only owned her primary home.

- **Nov. 8, 2018**:  Roberts attorney Carey wrote to Garrison asking them to provide an analysis of how they were applying an exception that did not apply to Robert's claim.

- **Nov. 10, 2018**:  Roberts attorney Carey writes to Garrison to say at least the uncontested part of the claim, for which Roberts offered more than enough evidence, should be paid so Roberts can start to get some of her life back in order.  Garrison will not pay this uncontested amount until Dec 19th.

- **Nov. 12, 2018**:  Roberts attorney Carey wrote to Garrison that there was no basis for a 10% limitation, and it was "inapplicable and improper."  It "is impossible to understand the propriety of USAA's actions."

- **Nov. 12, 2018**:  Roberts attorney Carey further notifies Garrison that they never provided an analysis he had previously requested on their untenable opinion. Roberts had not received the coverage explicitly promised in her policy.  He wrote, "We find your conduct to violate the

contractual covenant of good faith and fair dealing and to be tortious bad faith."

- **Nov. 23, 2018:** The adjuster wrote, "It is clear from that language that any personal property that would normally be kept in the insured's home, but is not there at the time a loss occurs would be subject to 10% of the personal property limit." This statement is erroneous and illogical. Before making this statement, Garrison quotes the policy provision on which they tried to base their conclusion. But the policy language only limits coverage on PP usually located in a secondary residence. Thus the limitation only applies to insureds who have multiple residences. This limitation did not apply to Roberts, who only owned one home. And even if Roberts had owned more than one home, the restriction still would not apply as all the stolen PP was usually in her primary residence.

- **Dec. 12, 2018**: Roberts' attorney Carey wrote to Garrison to again say the 10% limitation did not apply to PP in storage. He wrote to Garrison, "your position was contrary to the plain language of the policy." "Each of these failures breaches the contract and constitutes bad faith. USAA needs to correct things now." Carey warned Garrison that the coverage position was wrong. "Having practiced insurance law for three decades now, I will be stunned if language that on its face says one thing means the exact opposite."

- **Dec. 12, 2018**: Roberts' attorney Carey writes to Garrison: "As I stated if USAA acts with some alacrity here to remove the cap and immediately pay Ms. Roberts the fair value of her loss, it can avoid a bad faith lawsuit."

- **Dec. 16, 2018**: The other insurance Roberts had on some of her PP paid its $3,000 limit in full according to its policy provisions.

- **Dec. 19, 2018**: Garrison sent Roberts a check for the incorrect amount of $16,800 when the policy clearly showed she was due over $58,900. In the letter accompanying the check, Moran states that she met the request of Roberts' attorney by having the claim reviewed by outside counsel, which was a false statement. The claims file shows Moran or Garrison never consulted outside counsel.

- **Dec. 19, 2018**: Roberts attorney Carey wrote to Garrison to once again tell them that Garrison's interpretation of how to apply the limitation is not anywhere in the policy. "The duty of good faith and

fair dealing requires you to explain clearly and in writing how this exclusion means something entirely different."

- **Dec. 19, 2018**: Moran <mark>incorrectly</mark> closed the Garrison claim file, even though coverage was clearly in dispute, and Roberts' attorney had repeatedly told Garrison that the was no basis in the policy for their action.

- **Dec. 20, 2018**: After many requests, Moran at Garrison advises Carey that she will have counsel review the policy limitation, which attorney Carey has repeatedly told Garrison was wrong.  But Moran doesn't send it until January 9th.

- **Jan. 11, 2019**: Garrison's in-house counsel admits that his first opinion, requested by management, was wrong.  This time <mark>he spoke the truth</mark> and concluded that Roberts' policy has no sub-limit on Roberts' property in a public storage facility.  Robert's attorney had told Garrison that at least five times.  Garrison nonetheless held back $42,000, <mark>which belonged to Roberts</mark>. Mattison's correct ruling is not immediately made known to Roberts' attorney.

- **Jan. 18, 2018**: Having not heard anything from Garrison in nearly a month, Robert's attorney files a class-action lawsuit against Garrison for their fraudulent mishandling of this and similar claims.

- **Jan. 26, 2019**: Garrison calls Robert's attorney with the news that their in-house counsel reversed his opinion.  Moran said they were finally ready to pay the correct claim amount due to Roberts.  But when told the attorney had already filed a lawsuit against Garrison, <mark>Moran threatened to withhold payment unless the attorney withdrew the lawsuit</mark>.   Moran said on the recorded phone call, "...I was going to go ahead and pay this, but since you did that (file lawsuit).  If you don't want to remove the suit, then we'll hold off ... unless you want to withdraw the suit, it's up to you."  Robert's attorney <mark>reminded her that to withhold payment would be one more act of bad faith for Garrison. He</mark> said, "Well, no, it's really up to you.  First of all, it's a class action, and second, it's your decision whether or not you're going to withhold money that you now concede are owed.  I mean, that's really going to a question of whether it's more bad faith or not."

- **Jan. 26, 2019**: Following this conversation, Garrison issued the proper check paying just over $42,000, w<mark>hich they should have paid previously.</mark>

## 5. Opinions

### Summation:

I.   Garrison acted in bad faith by trying to get Roberts to accept only $16,800 in claim payment when she had up to $168,000 coverage under her policy for the theft of her PP.  They misapplied and misinterpreted the policy provision and tried to limit her coverage in direct conflict with the promised coverage of the policy.  They tried to defraud her.  Garrison ignored the clear language of Roberts' policy.  Rather, Garrison falsified and misinterpreted the insurance policy to try to withhold proper payment.  They were deceitful in their practices.

II.  Garrison acted in bad faith when they worked to withhold the promised policy coverages.  Roberts hired legal assistance to fight for the coverage, which was rightfully hers.  Garrison fought her legitimate claim for many months when the policy was unwavering in its coverage.   Garrison used counsel who was either unwilling or unable to evaluate the coverage in Roberts' policy.  Garrison misrepresented policy coverage to Roberts.  Regardless of the wrong guidance from counsel, Garrison adjusters had the correct policy language right in front of them and should have settled the claim fairly.  Garrison tried to justify their fraudulent treatment of their client by claiming the policy was reviewed by outside counsel.

III. Garrison further acted in bad faith and tried to put Roberts through additional hoops to get her just settlement.   Garrison delayed payment without cause.  Once Garrison determined they were only going to pay Roberts $16,800, they only needed evidence of a loss equal to $16,800 to pay the claim.  But they kept going back for more evidence, more than was needed.

IV.  Garrison's in-house counsel finally conceded that Garrison should pay the claim in full.  However, Garrison was slow in relating the news to their client.  And when they found out that Roberts' attorney had filed a bad faith lawsuit, in further bad faith, Garrison threatened to withhold payment unless the attorney dropped the lawsuit.

A. Opinion on: 10% Cap Provision -- Applicable standards as to Garrison's position, investigation, and communications with insured.

1. After I reviewed all documents provided (Factual Basis above), I am convinced that Garrison acted in bad faith and unfairly dealt with their insured by trying to deny the full coverage they sold to Roberts.

2. While remodeling her home, Roberts put much of her PP into storage.  While there, her PP was stolen.  Roberts had up to $168,000 coverage for her possessions in a public storage facility under her Garrison homeowners' insurance policy. But Garrison, without legal standing and contrary to policy wording, only offered to pay $16,800 under an insurance policy, which granted much more coverage.  Roberts was entitled to the entire amount of her loss, which was over $58,000.  Garrison engaged in false and deceptive means to try to get Roberts to believe she only had $16,800 coverage on this personal property.

3. In the policy sold to Roberts, USAA/Garrison (Garrison) promised that "We cover personal property owned or used by an "insured" **while it is anywhere in the world**."  (USAA HO Policy HO-9R(02) Page 4 of 34 (emphasis added)

4. This promise is clear.  Unless there is a specific exclusion or limitation which applies, Roberts' personal property (PP) was covered anywhere.  And under Roberts' insurance policy, there was no limitation for property in a public storage facility.

5. Even though Roberts had up to $168,000 PP coverage while it was in storage, Garrison withheld full claim payment and tried to deceive her into accepting only $16,800.

6. There is one provision in the policy whereby PP claims would be limited to only 10% of the coverage purchased.  The policy provision states, "the amount of insurance for personal property usually located at any "insured's" residence, other than the "residence premises" is limited to 10% of the amount of insurance for Personal Property Protection, or $1,000 whichever is greater."  Anyone with a rudimentary understanding of

insurance or English should understand this provision.  It only applies if the insured has PP customarily located in a residence other than the insured's primary residence or home.  Thus if I had $100,000 of PP coverage in my primary home, and I also had a secondary home, then the PP I kept in my second home would be limited to $10,000 or 10%.  But the PP in my main home would be covered up to $100,000 where ever it was, including in a storage facility. The intent of this policy is clear: the insurance carrier promises to cover the personal property in the insured's primary home up to the limit purchased while it is anywhere in the world.  But the insurer does not want to extend the same coverage limit to the second, third, fourth, or any other homes of the insured. If an insured has multiple homes, the correct way to secure insurance is to purchase separate homeowners' policies on the other locations, each with its own personal property limits.  But as an accommodation, the primary home policy form does extend 10% coverage to personal property in these other homes in case the insured did not buy separate coverage.

7. Since Roberts only owned one home, there is no possible way this limitation could apply to her claim.  Garrison has no right to cite this provision unless its insured has more than one residence.  Garrison misapplied this limitation when it was not anywhere in the Roberts policy.  They tried to get Roberts to believe that this limitation applied to her primary residence PP. But this limitation could not have applied to any of Roberts' personal property because she only owned one residence. There was no justification for using the secondary residence limitation to this claim.

8. But Garrison did try to deceive the insured and get her to accept $16,800 instead of the $58,900 due her.

9. Dawn Dodd (Dodd) performed the initial handling of this claim for Garrison and wrote to Roberts.  "Thank you for trusting USAA with your insurance needs.  My name is Dawn Dodd (Dodd), and I'm handling your property claim."  Dodd, in her claim notes, mentioned the 10% limitation, but then correctly concludes, "the storage facility is not an insured's residence."  Her conclusion indicates the restriction of coverage did not apply, and Garrison was responsible for paying the full claim.  Dodd read the policy correctly.  However, management intervened and asked that the file be reviewed by counsel, even though the policy wording was

clear and precise.  Garrison had a responsibility to pay the claim in full.

10.      Garrison management asked their in-house counsel James Mattison (Mattison) to give a legal opinion on whether the 10% limitation on PP of other residents would apply to PP of the primary house, which was Roberts' only residence.  The question itself does not make sense since Roberts did not have any secondary residences.  Garrison was looking for a way to limit payment of this claim.  Mattison ignored Roberts' policy and stated there was a 10% limitation on PP in storage facilities even though any such limitation was nowhere to be found in Roberts' policy.

11.      With even minimum legal training, Mattison should have known enough to read the actual policy under question correctly. There was no storage facility limitation under the Roberts policy. But that did not stop Mattison.  He gave Garrison management a green light to limit the claim to $16,800 and not pay Roberts the $58,900 due.

12.      Bill Wilson, a popular speaker on insurance, says "RTFP," which means don't make any insurance coverage decision until you "Read the ... Full Policy".  (When Words Collide pg. 77 last paragraph) No counsel should advise on policy coverage without taking the time to make sure he reads the correct policy in its entirety.  And no claims adjuster should ever deny or limit a claim, when the policy clearly says it should be paid in full.

13.      In addition to the policy itself, USAA guidelines on handling personal property away from the residence premises (USAA 01230) says this claim should be paid in full.  USAA's guidelines state that on the HO2008 form, (Roberts' form) the coverage for unscheduled personal property in storage is "100% of Coverage C".  100% of coverage C was $168,000 for Roberts not the $16,800 Garrison tried to pay.

14.      After counsel's opinion, the claim file shows that Dodd, who made the only correct assessment, no longer worked on this claim.  And her accurate evaluation that the storage facility was not a residence was never followed.  Rather than paying the claim in full as the policy required, Garrison offered Roberts $42,000 less than she was due.

15.     Roberts knew Garrison was not handling her claim correctly.  She hired attorneys who sent letter after letter notifying Garrison that Mattison and their claim department were unreasonable, wrong, and acting in bad faith.  Roberts' attorney asked for an analysis of the counsel's determination, but Garrison never produced any logical explanation.   And Roberts' attorney repeatedly told Garrison that to falsely deny the full claim payment amounted to bad faith.

16.     Counsel should know enough to read the applicable policy correctly before giving an opinion on coverage.  After three months of trying to cheat Roberts out of her full settlement, Garrison finally went back to ask Mattison to verify his opinion. When asked for a further review, Mattison said he made a mistake.  He admitted that Roberts' insurance policy unquestionably required full payment of her claim.  This could have been realized four months sooner if Garrison had listened to Dodd's statement that a storage facility is not a residence or if Moran had adequately read the policy.  As a prerequisite to assessing coverage, Garrison should have read and honestly analyzed the relevant policy language of the policy sold and quoted to their insured.

17.     The USAA policy, a Preferred Protection Plan, tells its insured to "read your policy carefully."  It states, "This policy is a legal contract between you, the policyholder, and us, the insurer. And like other contracts, it contains certain duties and responsibilities to both parties of the contract."  Then it goes on to say, "It is therefore important that you read your policy." Garrison did not follow their guidance and did not bother to read the right policy.  And Garrison did not feel they had to follow the requirements of that contract.  And in bad faith, Garrison tried to save themselves over $42,000 by ignoring the "duties and responsibilities" they had under this and which they told their insured were important.

18.     Garrison wrote to Roberts' attorney to explain why they wanted Roberts to accept their unwarranted settlement of $16,800.  First, they quoted the contract provision.  "The amount of insurance for personal property usually located at an "insured" residence, other than the "residence premises" is limited to 10% of the amount for Personal property protection". Then Garrison made a thoughtless and irresponsible

interpretation of this provision, ignoring the fact that this limitation only applied to property usually at a secondary residence. They wrote, "It is clear from that language that any personal property that would normally be kept in the insured's home, but is not there at the time a loss occurs, would be subject to 10% of the personal property limit." (Emphasis added.) This coverage argument made by Garrison is the most unjustified coverage interpretation I can remember in 37 years in insurance. And when their in-house counsel revisits the question, he too says there is no 10% limitation on PP of the primary home, including when it is in a storage facility.

19.     It is bad faith for Garrison to so blatantly misrepresent their policy and deceptively use fraudulent interpretation to withhold fair claim payment from their insured.   For anyone working in insurance to take a limitation on PP of a secondary residence and try to apply it to any personal property of the insured's primary home is acting unreasonably and fraudulently. Garrison appeared to be determined to underpay this claim regardless of what the policy said.   Garrison's position is akin to that of an auto insurer who says your car is covered for its' Actual Cash Value (ACV) if it's damaged in your garage, but anywhere else, they will only pay 10% of the car's value.

20.     In delivering the policy to Roberts, USAA writes, "Our mission at USAA is to help protect your financial security.  One way we do this is by helping you determine if you're adequately covered in the event of a loss." The truth is that when USAA dealt with Roberts, Garrison worked hard to deceive her and to pay much less than the adequate coverage she purchased.

21.     In its answer to the complaint, "Garrison states that its insurance contracts are written contracts which speak for themselves." (Pg. 3, 8-9) Unfortunately, Garrison was unwilling to listen to what the contract/policy was saying. Rather than following their contract with their insured, Garrison offered falsified policy interpretations to keep back $42,000 from Roberts.

B. Opinion on: Claimed referral to outside counsel – Applicable standards as to Garrison's investigation, communications with insured, and communications with insured's counsel regarding the supposed referral to outside counsel and supposed second referral to in-house counsel, including whether any referral was even needed and whether the referral went to a person with the willingness and/or ability to address it.

1. There was no logical or necessary reason for Garrison even to ask an attorney about a policy limitation that was crystal clear in its grant of coverage for this claim.  The limitation only applied to PP usually in a secondary residence and to no other PP.  Garrison went to great lengths in their attempt to cheat their insured out of her proper coverage.  For in-house counsel to support their 10% limitation was fraudulent and unwarranted.

2. Robert's attorney repeatedly told Garrison that their interpretation did not follow the policy and was unfounded.  Garrison tried to justify their fabricated decision by claiming they checked with a second counsel, but the truth is they only checked with their in-house counsel once again.

3. Only after Garrison's actions led to the threat of a lawsuit from Roberts' attorney did Garrison even refer this matter back to their in-house counsel, which was long after they said they would, and never was it referred to outside counsel.

4. When Garrison finally released the $16,800 payment rather than the $58,000 due, they tried to justify their actions by saying, "Please be advised, as per your request, USAA had the policy language reviewed by outside counsel.  Based on outside counsel, the total coverage available for this loss for the personal property is limited to 10% of the amount of insurance for Personal Property Protection".  But it is clear from the claim file that outside counsel was never contracted.  Only in-house counsel reviewed this claim.  Once again, Garrison was dishonest – dishonest about the policy, about Roberts' coverage, and about their actions.

5. On Dec. 20th Lisa Moran (Moran) wrote to Carey, "As we discussed, I will have a secondary review of the policy and contact you when I receive a response.  please [sic] be aware that this may take a little longer for a response due the holidays."  But she held off sending it for further review until Jan. 9th.  And the "secondary" review was not by any new counsel.  She just sent it back to the first reviewer,

Mattison.  This time, Mattison made the correct assessment.  Moran learned that her interpretation of the policy was wrong, just as Roberts' attorney had told her time and time again.

6. In the first place, Garrison's claim department made their own decision to apply the 10% limit, before in-house counsel had a chance to issue an opinion.  On Oct. 3rd, Amanda Anaya enters notes from her phone conversation with Roberts and advised her, incorrectly, that PP away from the residence premises was limited to $16,800.  It wasn't until Oct 7th that Mattison issued his erroneous opinion.  The other claim adjusters ignored Dodd's statement that a storage facility is not a residence.

7. The Roberts' claim file was transferred and reassigned.  The new claim adjuster Daphne Pabon-cortez was the 12th or 13th claim personnel to work this claim.  She wrote in her notes: "attny has presented reason that covg should be afforded at full property lim / language reads that when upp is somewhere other than the residence premises 10% of upp covg or $1000 whichever is greater / need to communicate this info per legal dept agreement of this extension."  (Breaks and emphasis added.)  Her statement was dishonest.  The legal dept did not make any ruling on the other resident provision.  Mattison ignored this section of the policy. His action was dishonest.  Garrison had no right to use a provision that was not in the policy to lower Roberts' claim payment.

8. Garrison mishandled this claim and, in the process, mistreated Roberts.  They tried to use a policy provision that had no bearing whatsoever to this claim to withhold fair payment.   First, Garrison made the mistake of trying to manipulate the policy to only pay $16,800.  But then to add injury to insult, they delayed paying even that ridiculous amount by months, long after they had enough evidence to justify the payment.   They held back this small payment and made Roberts suffer without her personal property and made her jump through additional hoops.

9. While their insured was struggling financially to try to replace the stolen PP, Garrison had a price list from Sept 18 showing PP much higher in value than the $16,800 they were holding.  And they knew the storage facility insurance would not pay more than $5,000.  Yet they withheld the lowball payment of $16,800 for months.

C.  Opinion on: Verification of ownership – Applicable standards as to Garrison's position and investigation, relative to internal policies regarding verification of ownership.

1.  ==Garrison sent Roberts through hoops beyond the ordinary needed to settle property claims.==  They required proof of ownership t==o a ridiculous level.==  The PP was from her house and placed in storage by her.  Roberts provided lists.  Roberts provided Photos.  Roberts provided receipts.  More than enough to justify Garrison's lowly payment of $16,800.  Yet Garrison never sent the check until money after month passed.

2.  On Dec 6, Moran of Garrison wrote Roberts' attorney ==asking Roberts to go through additional hoops.==  She wrote, "Provide any proof of ownership, if available, on any items over $250.  We have received some original receipts from her already, so will be for any other items she may have not provided."  ==Asking for evidence of ownership on items as immaterial as $250 is undoubtedly sending your client through hoops.==  Asking for receipts on items as little as $250 is burdensome, especially since another claim adjuster had told Roberts months earlier that they only needed receipts on items over $2,500.  Following a Sept 12, 2018, phone call, that adjuster noted: "Verified we don't receipts for each line item.  Advsd to get receipts for high $ items >$2,500 and/or specialty items – if she has photos that would be helpful."  However, Moran didn't stop at items over $2,500; she asked for items as low as $250.

3.  Adjuster Philip Erickson (Erickson) went even further when he advised Roberts to send in VOO (verification of ownership) on **all** items."  (emphasis added).  But then Erickson did relent and advised that without receipts, Garrison would use standard pricing.  ==Even if Garrison used standard pricing, they had enough justification for sending out their low-ball figure of $16,800, but in bad faith, they held that back for months.==

4.  ==Garrison's claim handling process fell way short of the claim handling ability of Orange Door.==  Once Orange Door had enough evidence that there was at least $3,000 worth of PP stolen from Roberts, they paid their $3,000 limit.  Garrison, on the other hand, said there was only $16,800 of coverage.  ==But then they continued to make Roberts jump through hoops even after they had more than enough evidence to pay $16,800.==

D. Opinion on: Threat to withhold conceded coverage payment unless suit dismissed Applicable standards as to Garrison's position, communication, and negotiations with insured.

1. Two weeks after Mattison admitted his mistake on coverage, Moran called Robert's attorney Carey.   She told him the news that their in-house counsel corrected his opinion and they were ready to pay the correct claim amount due under Robert's policy: the $42,000 they had withheld from Roberts.

2. But when Carey told her that he had already filed the bad faith lawsuit, Moran threatened not to send the payment unless Carey withdrew the lawsuit.   In the recording, which I transcribed, she said, "… I was going to go ahead and pay this, but since you did that (file lawsuit).  If you don't want to remove the suit, then we'll hold off… unless you want to withdraw the suit, it's up to you."

3. Robert's attorney advised Garrison that to withhold payment per her threat would be one additional action of bad faith.  He said, "Well, no, it's really up to you.  First of all, it's a class action, and second, it's your decision whether or not you're going to withhold money that you now concede are owed.  I mean, that's really going to a question of whether it's more bad faith or not."

Summary:

1. Garrison acted in Bad Faith.  The policy was clear and unambiguous.  Garrison should have paid this claim in full without forcing Roberts to have to revert to hiring legal counsel.  Yet Garrison, with disregard of their client's rights, worked many angles to try to deny proper payment.  They tried to manipulate the policy to limit the claim to only a small fraction of what was due to Roberts.  Then after offering an unreasonably low limit, Garrison held that payment up for months.  Garrison ridiculously misinterpreted the provision that was in her policy.

2. In its own Mandatory Initial Discovery Responses, Garrison lays out the basis for Bad Faith.  "To 'prove that [Garrison] breached the duty

of good faith and fair dealings, [Plaintiff] must prove: 1. [Garrison] intentionally [denied the claim, failed to pay the claim, **and/or** delayed payment of the claim] without a reasonable basis for such action; and 2. [Garrison] knew that it acted without a reasonable basis, **or** [Garrison] failed to perform an investigation or evaluation adequate to determine whether its action was supported by a reasonable basis."  (Emphasis added)

These are precisely the actions Garrison took.

3. Garrison certainly was intentional in denying the most significant portion of this claim. Garrison failed to pay the claim until Roberts hired an attorney, and Garrison was pressed time and time again to do the right thing.  Garrison delayed payment of the claim, even the small amount they lowballed.  And there was no reasonable basis for these actions. It was obvious to anyone, and now it is without dispute that Garrison had no basis for withholding full payment of this claim. Garrison's claim denial was unreasonable, and that was pointed out to them many times by Roberts' attorney.  Yet they refused to listen to logic and reason. They continued to act with total disregard to the policy without ever offering justification for their actions, likely because there was no justification.

4. Garrison acted without a reasonable basis.  Garrison failed to perform a thorough investigation or evaluation.  Even simply reading the right policy without prejudice, would have shown Garrison that this claim should have been paid in full.   Garrison owed its insured at least a simple investigation including reading the right policy without prejudice and without looking for a deceptive way to withhold payment.  Garrison certainly acted in bad faith as they defined it themselves.  Garrison made a ludicrous policy interpretation to try to justify their fraud.  From the beginning of this claim, Garrison was looking for an excuse to withhold payment.   And the one claims adjuster who did understand the policy was taken off the claim.

5. Arizona insurance law also defines unfair claim settlement practices (AZ 20-461.)  "A. A person shall not commit or perform with such a frequency to indicate as a general business practice any of the following: 1. Mispresenting pertinent facts or insurance policy provisions relating to coverages at issue."  Garrison misrepresenting facts and policy provisions in handling this claim.

6. Arizona law adds another infraction defining Unfair Claim Settlement Practices: "8 Compelling insured to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by the insureds."  Again, this is the perfect picture of Garrisons' handling of this claim.  Garrison repeatedly tried to pay only a small portion of the legitimate claim, and their actions compelled Roberts to institute litigation.

7. "9 Attempting to settle a claim for less than the amount to which a reasonable person would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application"  How much more severe is the unfair claim practice when the Garrison was unreasonable and would not follow their own policy.  For an insurance carrier to disobey their own policy is a much worse offense than even not following advertising promises.

8. "15. Failing to promptly provide a reasonable explanation of the basis in the insurance policy relative to the facts or applicable law for denial of a claim or for the offer of a compromise settlement."  Moran never did provide a reasonable explanation.   She quotes a policy provision and then falsified its meaning unreasonably to try to get Roberts to accept a compromised settlement to Garrison's financial advantage.

In the same response, Garrison then offers what's needed to recover punitive damages.  Garrison states one (or more) of these infractions justify punitive damages.  "1. [Garrison] intended to cause injury; **or** 2. [Garrison] was motivated by spite **or** will; **or** 3. [Garrison] acted to serve [its] own interests, having reason to know and consciously disregarding a substantial risk the [its] conduct might significantly injure the rights of the [Plaintiff]."  (Emphasis added)  Garrison committed all these offenses which warrant punitive damages, according to their filing.  They certainly knew that withholding over $42,000 legitimately owed to Roberts would cause injury as she could not replace her furniture, clothing, and other personal property.  Garrison was motivated by their will to pay less than the policy required.  They stuck to their indefensible position even though it was pointed out time and time again that the actual insurance policy did not justify their position.  Clearly, Garrison was serving their own interest in retaining $42,000 rather than paying the claim properly to Roberts.

9. Then the defendant's response goes on to say, "Additionally, an insurer's **reasonable** reliance on an expert opinion insulates the insurer from bad faith liability." (pg. 10 26 – 11:1) (Emphasis added) Garrison's decisions were not reasonable.  And an in-house counsel who was not knowledgeable enough to read the policy should not be considered an expert.  And before their counsel ever gave his opinion,

Garrison had already decided to misapply the provisions of the policy and deny their client proper payment. Garrison determined a deceitful path before ever relying on in-house counsel.  Moran never found a storage limitation in Roberts' policy, so she cited what she could find (a limitation on a second residence), and misrepresented it to Roberts to try to get her to settle for much less than what Garrison owed her. Garrison made their claim denial decision and stuck to it even when it was pointed out many times by Roberts' attorney that it was in error.

10.      Then Garrison, in their response, gave examples of three claims where bad faith claim was not allowed.  But none of those claims have any bearing on this claim.  And in none of those claims were the insurance carriers' actions as egregious and deceitful as Garrisons' actions. (11:1-14) The first and second claim examples involved legitimate questions on the cause of loss – why did the horse die, and how was the roof damaged? In this claim, there was no dispute as everyone agreed theft caused the loss, and the policy clearly covered theft.  The third claim example involved a dispute over the amount of the claim: was the injured party exaggerating her injuries?  But in this case, there was no dispute over the amount of PP stolen.  Garrison invented the only conflict in this case as they tried to create a way to limit this claim contrary to the coverage promises in the policy. Garrison acted in bad faith well beyond these other carriers who were trying to apply the policy provisions properly.  Garrison used fraud and misinterpretation to try to deceive their client.  In fact, after months of delay and with pressure from a reasonable attorney, Garrison dropped their indefensible position and admitted they were wrong all along.

11.      In fictitious movies, I've seen dastardly insurance adjusters, usually in pioneer times, deceiving their clients and denying claims or paying much less than the policy dictated.  But in these movies, the hero arrived (usually in a white hat) and made the adjuster pay the claim rather than letting him pocket the money.  These were fictitious stories; something I never thought I'd see in real life.  But here we are with an insurance carrier who didn't bother to read the right policy and took an indefensible and nonsensical position to deny the full claim owed to their client.  Garrison misrepresented the policy provisions for their own advantage.

12.      Sometimes there are legitimate questions and disputes about coverage.  But what happened here was not a legitimate coverage dispute.  It was a fraudulent and deceptive practice of trying to create limitations that were not in the policy.  It was a deceitful effort to

withhold money owed to their insured.  What happened here was Garrison trying to suppress a claim and then threatening not to release payment unless the lawsuit was dropped.  The Garrison policy was clear to anyone willing and smart enough to read it.  This claim should have been paid in full.  There was no legitimate reason for Garrison to hold back payment.

13.     Bill Wilson, in his book *When Words Collide,* states, "It is an established principle – e. g. Brassil v. Maryland Cas. Co., N.Y. 235, 104 N.E. 622 (1944) – that insurance policies are contracts *uberrimae fidei* ("of utmost good faith")."  Then he quotes this court case confirming that the insurance carrier must act in utmost good faith.

"When an insurer fails in its duty of fair dealing and good faith owed to an insured, the possibility of a bad faith suit exists.  A bad faith claim may exist when an insurer refuses to pay a direct claim where there exists no legitimate reason either based in law or fact to deny the insured's claim." – Dempsey v. Auto Ins. Co., 717 F.2d 556 560 (11th Cir 1983)"

14.     Tom Bower (Bower), an insurance attorney, is quoted by Wilson, in his book.  Bower found, in his experience and study, two different types of insurance carriers

Those that try to help their insureds and stand by the coverages they sold.  At the other "extreme are companies that treat every insured with a high index of suspicion and spend lots of time, effort, ingenuity, and creativity looking for ways to deny coverage wherever and whenever possible.  Once they decide not to cover something, they deny coverage 'with both feet,' assert every conceivable coverage defense, refuse to conceded or compromise anything, ignore any fact that does not fit their view of the case, take unreasonable positions, refuse to retreat from unsupportable positions, and litigate everything to the death."  The Garrison claims department, at least management, did indeed ignore the facts and went to great lengths to try to avoid paying a legitimate claim.  They took unreasonable and unsupported positions and, when shown the errors of their ways, refused to budge until challenged in court.

15.     The National Association of Insurance Commissioners' (NAIC) definition of Unfair Claim Practices includes

- Knowingly misrepresenting to claimants and insureds relevant facts or policy provisions relating to coverages at issue.

- Not attempting in good faith to effectuate prompt, fair and equitable settlement of claims submitted in which liability has become reasonably clear (or as in this case, totally clear)

- Compelling insureds to institute suits to recover amounts due under its policies by offering substantially less than the amounts ultimately recovered in suits brought by them.  (In this case, the carrier only offered a fair settlement after attorneys for the insured contacted them.  But by that time, it was clear that this was a carrier acting in bad faith.)

- Attempting to settle or settling claims for less than the amount a reasonable person would believe the insured was entitled to by written material, etc. associated with the policy (How much more it is bad faith when the policy says the claim is clearly covered yet the claim adjuster still attempts to settle the claim for a small percentage of the actual coverage amount.) (Comments added by me.)

- Failing in the case of claim denials or offers of compromise settlement to promptly provide a reasonable and accurate explanation of the basis for such action.  Moran and Garrison never offer any reasonable explanation for their response.  Their only explanation was inaccurate, and they were told so by Roberts' attorney on many occasions yet were unrelenting in their unreasonable and inaccurate claim handling.

16.    Garrison acted in bad faith as defined by NAIC.

17.    Wilson writes, "In Mariscal v. Old Republic Life Ins. Co (1996) 32 Cal.App.4th 1617, 1620 [50 Cal.Rptr.2d 224, bad faith was evidenced, according to the court, by the insurer's failure to properly investigate the claim.  According to the court: "When Investigating a claim, an insurance company has a duty to diligently search for evidence which supports its insured's claim.  If it seeks to discover only the evidence that defeats the claim it holds its own interest above that of the insured."  Garrison went far below this definition of bad faith as the evidence, without question, showed they should have paid the claim in

full.  Despite the facts, Garrison still acted in its own self-interest and refused to pay the claim as the policy demanded.

18.      Wilson cites another bad faith claim example. "Sometimes unfair claim practices can approach the level of bad faith.  In Burge v. Farmers Mut. Of Tennessee, NO. M2016-01604, 2017 WL 1372864 (Tenn. App. Apr. 13, 2017), the court affirmed an award that an award that included bad faith damages after an insurer repeatedly failed to explain to the insured what the basis for the denial of the claim was." Pg. 293)  If it is bad faith to repeatedly refuse to tell the insured the reason for claim denial, it is more serious bad faith to repeatedly give the insured a fraudulent reason for claim denial.

19.      Ironically several times on claim correspondence Garrison wrote the following.  "For your protection, Arizona Law requires the following statement to appear on this form. Any person who knowingly presents a false or fraudulent claim for payment of a loss is subject to Criminal and Civil penalties."  Yet Garrison didn't see anything wrong with their false and fraudulent actions in handling this claim.  When an insurance carrier acts in misleading and deceptive ways, they don't face the same Criminal and Civil penalties an insured would face.  The only just punishment for the insurance carrier acting in false and fraudulent ways is a ruling of bad faith with just damages.

**6. I have read the preceeding declaration and, under penalty of perjury, state that the contents hereof are true and correct.**

*Tiffany Roberts v. Garrison Property and Casualty Insurance Company*

U. S. District Court, District of Arizona Case No.: 2:19-cv-01232

Expert Opinion Affidavit of Daniel G. Fink
Signature Page


Daniel G. Fink, CIC, CRM, AAI


3-31-2020
Date